UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SHARON BRIDGES WORTHY | * | CASE NO. 10-10027 |
| | * | SECTION "A" |
| DEBTOR | * | CHAPTER 13 |

## <u>REASONS FOR ORDER</u>

The hearing on Sharon Worthy's ("Debtor") Motion for New Trial on Order Denying Motion to Extend the Automatic Stay,[1] confirmation of her proposed plan,[2] the Chapter 13 Trustee's ("Trustee") Objections to the Motion for New Trial and confirmation of the proposed plan,[3] was held on March 23, 2010.  Hearing on Trustee's Motion to Dismiss[4] and Debtor's Opposition to the Trustee's Motion to Dismiss for Bad Faith Filing[5] was conducted on April 23, 2010.  Following both hearings, the Court took the matters under advisement.

Debtor argues that her proposed plan should be confirmed because it is feasible, in the best interest of creditors, and proposed in good faith.  Debtor avers that her plan is proposed in good faith because it pays creditors 100% of their claims and dedicates 100% of her disposable income for this purpose. Trustee urges denial of confirmation and dismissal of this case based on Debtor's bad faith. Debtor also seeks a new trial on her request for the imposition of a stay pursuant to BRCP 9059. Trustee opposes Debtor's request for new trial.

---

[1] P-27, 39.

[2] P-15.

[3] P-42, 45.

[4] P-47.

[5] P-59.

**I.  Facts:**

Debtor filed a Voluntary Petition for Relief under Chapter 13 of Title 11 on January 6, 2010 ("2010 Case").[6]  After the filing of her Petition, Debtor requested the imposition of an automatic stay, which was denied after hearing.[7]   The instant Motion for New Trial was then filed. Simultaneously, Debtor's proposed plan came up for confirmation.

Debtor's proposed plan provides for monthly payments of $1,800.00 to Trustee for sixty (60) months.  The payments satisfy in full mortgage arrearage balances due to secured lenders.  The proposed plan also provides that monthly payments accruing postpetition to Debtor's secured lenders, Flagstar, State Farm and Bank of America, will be paid by Debtor directly and in addition to the amounts paid to Trustee.  No unsecured debt is scheduled or paid under the proposed plan.[8]

Previous to the filing of this case, Debtor has filed five (5) other cases in this district:

1.  Case number 99-15708, filed on October 4, 1999, under Chapter 13, dismissed on December 15, 1999 ("1999 Case");

2.  Case number 00-17044,  filed on November 7, 2000, under Chapter 13, dismissed on February 6, 2001 ("2000 Case");

3.   Case number 01-14417,  filed on May 30, 2001, under Chapter 7, discharge granted September 27, 2001 ("2001 Case");

4.  Case number 02-17632, filed on October 18, 2002, under Chapter 13, dismissed on July 23, 2008 ("2002 Case"); and

5.  Case number 08-12800, filed on November 18, 2008, under Chapter 13, dismissed on April 16, 2009 ("2008 Case");

---

[6]  P-1.

[7]  P-6, 27.

[8]  P-15.

Debtor's 1999 and 2000 Cases were dismissed when she failed to file a plan of reorganization timely, file schedules of assets and liabilities, statements of financial affairs, or attend her §341(a) meeting of creditors.[9]   In 2001, as a result of filing her Chapter 7 case, Debtor eliminated $297,492.00 in unsecured debt through a Chapter 7 discharge.  Secured debts were not affected because her Chapter 7 trustee abandoned all of her real properties as being unworthy of administration.[10]

Debtor's 2002 Case, Schedules of Assets and Liabilities ("Schedules"), as well as the Statement of Financial Affairs ("SOFA"), detailed assets many of which are also contained on Debtor's 2010 Schedules.  For example, every piece of real property held by Debtor in this case was also listed on her 2002 Schedule A and encumbered with mortgages held by the same lenders.[11]

On March 31, 2004, Debtor confirmed a plan in her 2002 Case that provided for step payments of $1,800.00 per month for twenty-four (24) months; increasing to $2,300.00 on November 2004 for twelve (12) months; followed by payments of $2,800.00 for the next twelve (12) months; and payments of $3,800.00 beginning on November 2006 for the final twelve (12) months of the plan.[12]

As of July 2005, Debtor was $3,974.00 behind in payments due under the plan.  Debtor made a total of $21,400.00 in payments during 2006 and a $2,300.00 payment in February 2007.  Debtor

---

[9]  2000 Case, P-13,15; 1999 Case, P-3, 8.

[10]  2001 Case, P-4, 8, 9, 19, 20.

[11]  2002 Case, P-10; 2010 Case, P-9.

[12]  2002 Case, P-95.

made no payments after February 2007.[13]

Debtor scheduled her marital status as "separated" in her 2002 Case.[14]  Her spouse's income was not listed.  Debtor reconciled with her spouse in 2003.[15]  Debtor's spouse earned income of $15,000.00 in 2006; $10,000.00 in 2007; $7,000.00 in 2008; and $3,000.00 in 2009.[16]

Debtor's 2002 Schedule I reflected gross annual income from employment with the State of Louisiana of $50,628.00.[17]  Debtor earned $61,386.00 in gross income from employment in 2006; $64,560.00 in 2007; $68,796.00 in 2008; and $25,100.00 in 2009.[18]

In 2002, Schedule I itemized $37,200.00 in annual income from rents.[19]  Debtor collected $12,800.00 in rents during 2007; $16,800.00 in rents in 2008; and $27,500.00 in rents during 2009.[20]

Debtor received tax refunds of $5,000.00 ("2006 Federal"); $6,000.00 ("2007 Federal"); $6,000.00 ("2008 Federal"); and $2,121.00 ("2008 State") during her 2002 Case.[21]

---

[13] Exh. W-1.  In addition to receiving $23,700.00 in payments from Debtor following the storm, some tax refunds from the State were sent to Trustee.  Flagstar also forwarded $7,483.00 directly to Trustee as excess proceeds received from insurance.

[14] 2002 Case, P-13.

[15] Testimony of Debtor, March 23, 2010, hearing.

[16] Testimony of Mr. Ray Worthy, March 23, 2010, hearing.

[17] 2002 Case, P-13.

[18] 2008 Case, P-18; 2010 Case, P-1.

[19] 2002 Case, P-13.

[20] Testimony of Mr. Worthy, March 23, 2010, hearing; 2008 Case, P-18; 2010 Case, P-1.

[21] Testimony of Debtor, March 23, 2010, hearing.

Debtor received a Road Home Grant of $30,000.00 during the 2002 Case.[22]

Debtor received $11,000.00 in insurance proceeds for damages sustained as a result of Hurricane Katrina during the administration of her 2002 Case.[23]

Debtor incurred loans in the aggregate amount of $29,000.00, payable to family members, during the administration of her 2002 Case.[24]

In 2002, Debtor scheduled secured debt with State Farm Acceptance ("State Farm), Flagstar Bank ("Flagstar"), Bank of America, N.A. ("Bank of America"), Industry Mortgage ("Industry") and NOME Federal Credit Union ("NOME").[25]

Debtor made no payments on postpetition accruing mortgage installments to State Farm after September 10, 2003.[26] Flagstar was owed on two separate mortgage loans secured by real property on Ursulines Street  ("Ursulines Loan") and Humanity Street ("Humanity Loan").

Debtor made no payments for postpetition accruing mortgage installments to Flagstar after August 29, 2005.[27]

Debtor made postpetition accruing payments to Bank of America on her home mortgage until December 2007.[28]  The amounts due Bank of America between December 2007 and April 2008 are

---

[22]  *Id.*

[23]  *Id.*

[24]  Testimony of Mr. Worthy, March 23, 2010, hearing.

[25]  2002 Case, P-10.

[26]  Testimony of Debtor, March 23, 2010, hearing.

[27]  *Id.* Debtor forwarded two payments to Flagstar in July and August 2008 but both were returned.

[28]  *Id.*

disputed and not determined by these Reasons.[29]  Debtor did not make payments to Bank of America from May 2008 through October 2008.  Debtor failed to make postpetition payments to Bank of America from November 2008 through April 2009.[30]  Following the filing of a Motion for Relief by Bank of America in the 2008 Case, Debtor satisfied these payments.[31]

The 2002 Case was dismissed on July 23, 2008.[32]  Debtor owed $57,197.00 to complete her plan.[33]

In July 2008, Debtor received $51,000.00 in settlement of her claims against Flagstar.  Flagstar also cancelled its mortgage against the property on Ursulines Street because the loan secured by that property had been satisfied.[34]

Debtor  made no payments under her proposed 2008 plan and failed to attend her §341(a) meeting of creditors.  The 2008 Case was dismissed on July 22, 2009.[35]

## II.  Law and Analysis:

To determine if a chapter 13 petition for relief has been filed in good faith or if a proposed plan is offered in good faith requires consideration of both objective and subjective factors.  The

---

[29]  In the 2002 Case, Bank of America filed a Motion for Relief from Stay alleging a postpetition default from December 2007 to April 2008 or five (5) months.  Debtor denied these allegations at the March 23, 2010, hearing. Because the motion was never decided, the allegations were not proven. 2002 Case, P-245, 260.

[30]  Testimony of Debtor, March 23, 2010, hearing. Two payments made in July and August 2008 were returned. 2008 Case, P-30.

[31]  Testimony of Debtor, March 23, 2010, hearing.

[32]  2002 Case, P-259.

[33]  Exh. W-1.

[34]  Testimony of Debtor, March 23, 2010, hearing.

[35]  2008 Case, P-33, 58.

6

standard for good faith applicable to repeat filers is similar to the standard of good faith required for confirmation.[36]   As a result, the same evidence may be relevant to both inquires.[37]   When a debtor files a bankruptcy case within one year of the date of dismissal of a prior bankruptcy case, the automatic stay exists for only thirty (30) days from the petition date unless extended by court order. The stay may only be extended upon a showing of good faith.[38]

A material change in circumstances arising after dismissal of the prior case is a factor that weighs in favor of a debtor's good faith and extension of a stay.  For example, a material, positive change in employment may mean that a feasible plan can be proposed and benefit creditors. However, with or without a material change, a debtor's subjective intent to complete a plan is critical.  The most feasible of plans cannot succeed if a debtor simply fails to honor her obligations. For this reason, extension of a stay in a case involving serial filings always involves weighing the possibility of abuse of the bankruptcy process.

Similarly, the good faith standard required for confirmation focuses on a debtor's intention to perform the obligations required by the plan or to abuse the process.[39]   Although a chapter 13 Plan may, as a mater of law, cure arrearages on mortgage debt, it may nevertheless violate the purpose and spirit of chapter 13 and thus lack good faith.[40]   Good faith is the policing mechanism to assure that those who invoke the reorganization provisions of chapter 13 do so only to accomplish the aims

---

[36] *In re Tomasini*, 339 B.R. 773 (D.Utah 2006).

[37] *In re Johnson*, 708 F.2d 865 (2nd Cir. 1983).

[38] 11 U.S.C. §362(c)(3).

[39] 11 U.S.C. §1129(a)(3).

[40] *Matter of Metz*, 820 F.2d 1495 (9th Cir. 1987).

and objectives of bankruptcy philosophy and policy.[41]  A determination of good faith involves

weighing the totality of the circumstances surrounding a chapter 13 plan, including consideration

of whether or not there has been abuse of the provisions, purpose or spirit of chapter 13.[42]

While serial filings by a debtor do not necessarily constitute bad faith, Debtor's prepetition

conduct, including her conduct in prior cases, is a valid consideration in determining both a debtor's

good faith in filing a subsequent case and confirmation of a proposed plan.[43]  Good faith involves

the assessment of a debtor's subjective intention to comply with and complete a plan.  The past may

be prologue in this determination.

The proximity of serial filings, the debts listed, amounts paid, income and expenses listed

in successive cases are all important indications as to intention.[44]  Specific and material

misrepresentations or omissions in connection with a debtor's prior case administration, are relevant

to a debtor's assertion of good faith in a subsequent case, as well as, her intent to comply with the

terms of her plan and the requirements of the Bankruptcy Code.

<u>Debtor's Filing History</u>

The filing history of Debtor is significant.  This is Debtor's sixth case in 10 ½ years.  Her

first two cases, both filed under chapter 13 a year apart, were dismissed when she failed to file a plan

timely.  In each of these cases, Debtor also failed to file her schedules, SOFA, and attend a §341(a)

meeting.  Her third case, a chapter 7 filed approximately six (6) months after the 2000 Case's

---

[41] *In re Chase*, 43 B.R. 739 (D.C.Md. 1984).

[42] *In re Humphrey*, 165 B.R. 508 (Bankr. M.D. Fla. 1994).

[43] *In re Tucker*, 989 F.2d 328 (9th Cir. 1993).

[44] *In re Harlan*, 179 B.R. 133 (Bankr. W.D. Ark. 1995).

dismissal, resulted in a discharge of debt.  Each of these cases caused a stay in the foreclosure actions of secured lenders.  However, because Debtor failed to prosecute her first two cases and the chapter 7 trustee abandoned all real property as unworthy of administration, none of the secured claims received distributions from the cases.[45]

The 2002 Case

The 2002 Case was far from the smooth ride Debtor's counsel portrays.  It also interrupted ongoing foreclosure proceedings by Flagstar.  Debtor failed to correctly list the past due balances owed to Flagstar in her Schedules or proposed plan although those amounts should have been easy to calculate from the foreclosure pleadings.  She also failed to list *any arrearage* to Bank of America, even though she had failed to make payments on her home mortgage for the ten (10) months leading up to this case.[46]  Debtor scheduled her debt to NOME as $46,243.00, an amount significantly below that due although the debt was subject to recorded judgments and could be readily calculated.[47]

Following the filing of the 2002 Case, Debtor failed to consider pleadings and proofs of claim filed by secured lenders in the submission of her proposed plans.  For example, Flagstar filed a Motion for Relief from Stay on its Humanity Loan on December 9, 2002, detailing prepetition

---

[45]  *See*, 2002 Case, Motions for Relief from Stay filed by Flagstar, P-11, 38.  All subsequent references to case pleadings will be to the 2002 Case unless otherwise specified.

[46]  *See*, Motion for Relief from Stay filed by Bank of America, P-245; POC 3-1filed January 30, 2003.

[47]   P-10.  NOME's proof of claim calculated the balance due on its judgments as in excess of $75,000.00, an amount the Debtor accepted as correct. See, POC 6 ,8; P-69, 87, 93.  NOME's Response to Debtor's Objection details under reporting by Debtor of both the debt to it and other secured claimants as well as her under valuation of property in her Schedules.  Its allegations are based on proofs of claim, pleadings of record and financial statements delivered to NOME prior to filing.  *See*, P-87.

defaults of twenty-seven (27) months.[48]  It also filed a proof of claim on January 31, 2003, claiming

an arrearage on the Ursulines Loan of $20,753.00.[49]  Bank of America filed a proof of claim on

January 30, 2003, alleging prepetition defaults of $20,029.00.[50]  Although each of these pleadings

were filed prior to Debtor's initial hearing on confirmation, none were taken into account in

Debtor's proposed plan.[51]   Debtor's plan was filed untimely and only after the Trustee filed a

Motion to Dismiss.[52]  Flagstar filed an Objection to confirmation based on the proposed plan's

failure to provide for Flagstar's arrearage on the Humanity Loan.[53]  As a result, confirmation was

denied as unfeasible.  The Court also noted in its reasons for denial Debtor's failure to supply

sufficient information to Trustee.[54]

          After denial of confirmation, Trustee filed a second Motion to Dismiss.[55] Approximately a

month after her initial plan was denied confirmation, Debtor filed an amended plan.[56]  The amended

plan corrected the arrearage due to Flagstar on the Humanity Loan, but again failed to include any

arrearage for Bank of America's claim or correctly provide for the arrearage on Flagstar's Ursulines

------

[48]  P-11.

[49]  POC 4-1.

[50]  POC 3-1.

[51]  P-6, 25.

[52]  P-2, 6.

[53]  P-23. Flagstar did not object to the proposed plan's failure to properly provide for the arrearages due on
its Ursulines Loan.

[54]  P-25.

[55]  P-26.

[56]  P-31.

Loan.[57]   The amended plan was confirmed on April 8, 2003, despite its failure to pay the arrearages

due Bank of America and Flagstar on the Ursulines Loan.[58] Six days later, Flagstar filed a second

Motion for Relief from Stay on its Ursulines Loan ("Second Flagstar Motion").[59]

The Second Flagstar Motion alleged prepetition and postpetition arrearages on the Ursulines

Loan, including missed postpetition payments for every month following the petition date.  It also

reasserted prior filed cases as acts of bad faith.  The Second Flagstar Motion was granted on May

7, 2003.[60]  By Consent Order, the stay was reinstated when Debtor paid Flagstar $3,566.11 or the

entire outstanding  postpetition arrearage, including costs and attorney's fees.[61]

Two (2) months later, State Farm filed its own Motion for Relief from Stay alleging a past

due arrearage of $21,888.00, including ten (10) months postpetition.[62]  This motion was granted on

September 10, 2003 without opposition.[63]

Following the Consent Order with Flagstar on the Ursulines Loan and the granting of stay

relief in favor of State Farm, Debtor requested modification of her confirmed plan to adjust the

Flagstar deficiency amount for the Ursulines Loan and eliminate any sums payable to State Farm

---

[57]   Flagstar filed a proof of claim on the Ursulines Loan on January 31, 2003, claiming an arrearage of
$20,753.00.  *See,* POC 4-1.  Bank of America filed a proof of claim on January 30, 2003, claiming a $20,029.00
prepetition arrearage.  *See,* POC 3-1.  Flagstar's proof of claim on the Humanity Loan was filed on March 17, 2003,
claimed an arrearage of $20,753.00.  *See*, POC 5-1

[58]   P-37.

[59]   P-38.

[60]   P-42.

[61]   P-46.

[62]   P-52.

[63]   P-61.

under the plan as a secured claimant.  Again, no amounts were earmarked for Bank of America.[64]

Prior to a hearing on the modification request, NOME filed its proofs of claim.[65]

Following the filing of proofs of claim by NOME, Debtor belatedly objected to the proofs

of claim of Bank of America and NOME.[66]  Prior to hearing, Debtor acquiesced in the amounts

claimed and withdrew her Objections.[67]  A second request to modify plan was filed on March 2,

2004.[68]  Although Debtor admitted lacking sufficient income to support repayment of the amounts

claimed, the plan was modified at a hearing on March 4, 2004.[69]

Debtor's failure to correct her "oversights" delayed confirmation, as well as, the correct

distributions to claimants for seventeen (17) months.  After initially confirming her plan almost six

(6) months after filing, Debtor was forced to immediately modify the plan two (2) times because she

had not provided for payments on filed proofs of claim to secured lenders.  Those modifications

were not implemented until March 2004.  During the early administration of her 2002 Case, Debtor

also failed to pay her secured lenders postpetition and had to defend three (3) different motions for

relief.[70]  Trustee's history of payments, submitted into evidence, reflects that Debtor did not make

her first payment on the plan until January 2003 or two (2) months late.  After bringing her payments

---

[64]  P-71.

[65]  POC 6-1 as amended by POC 8-1.

[66]  P-67, 69.

[67]  P-93, 94.

[68]  P-95.

[69]  P-98.  Although approved by the Court on March 4, 2004, the Order was not entered until January 9,
2006. P-118.

[70]  *See*, Motions for Relief filed by Flagstar and State Farm, P-11, 38,  52. All three (3) requests were
granted.  *See*, P-20,42,61.

current, Debtor fell behind before Hurricane Katrina when she failed to make her December 2003

payment and paid less than the amounts required in November 2003 and January 2004. She was

actually behind by $3,974.00 when Hurricane Katrina occurred.[71] Following the storm, Debtor went

into further and material default. Certainly, Hurricane Katrina is a valid excuse for default.

However, it is Debtor's post-storm behavior that the Court finds inexcusable.

In August 2005, Hurricane Katrina devastated the New Orleans area. All of Debtor's rental

properties were flooded and her home lost its roof. Debtor lost all rental income and lacked

insurance, in most cases, for repairs.[72] Not unlike other debtors in the Eastern District of Louisiana,

Debtor's finances were in chaos and her plan was in default.

Following Hurricane Katrina, Debtor failed to make her monthly payments to Trustee. This

resulted in the filing of a form motion for dismissal, not unlike literally thousands filed in early

November 2005.[73] Despite Trustee's arguments to the contrary, and because of the extraordinary

circumstances surrounding Hurricane Katrina, this Court routinely continued Trustee's requests for

dismissal based on a failure to make plan payments for all cases pending in the district while debtors

were located, counsel were located or new counsel were secured, debtors' claims against insurers

were concluded, jobs were reinstated or new employment was found, public grants were paid, and

lives were righted. In thousands of cases, the Court's patience and effort were rewarded as debtors

and their counsel reestablished themselves, paid off plans, reworked cases and satisfied hundreds

---

[71] Exh.. W-1.

[72] Testimony of Debtor, March 23, 2010, hearing.

[73] P-112.

13

of millions of dollars in debt.  This case, however, represents one of a very few where the debtor took advantage of the Court's generosity and concern.

Debtor's first request of this Court was for additional time to pursue mortgage lenders on insurance claims.  Debtor represented that without her rental properties, she lacked sufficient income with which to make plan payments.  Debtor's stated goal was to obtain insurance proceeds necessary to repair her rental properties and right her financial condition.  Specifically, as Debtor battled with Flagstar over the amounts owed and the existence of coverage, Trustee's Motions to Dismiss were continued.[74]

From August 2005 until May 2008, Debtor conducted discovery and motion practice against Flagstar.  She also managed to make $21,400.00 in payments during 2006 and one payment of $2,300.00 in February 2007.  No additional payments were received after February 2007.[75]

In April 2008, Debtor's 2002 Case came to a head.  Bank of America filed a Motion for Relief from Stay alleging past due postpetition installment payments from December 2007 forward.  While Debtor denied this was the case, she did admit withholding payments to Bank of America for May and June 2008 while its Motion for Relief from Stay was pending and dismissal of her case was imminent.

Bank of America's Motion for Relief from Stay was not decided because at its hearing in May 2008, Debtor's counsel abruptly informed the Court that the almost three-year battle with Flagstar had concluded.  Counsel represented that a settlement on undisclosed terms had been

---

[74]  Debtor did not pursue claims against State Farm on her other rental properties nor did she file any action against Bank of America or her home insurer.  Until these hearings, the Court was unaware that Debtor's home insurer settled a claim for $11,000.00 or that Debtor had received $30,000.00 in Road Home grants for uncompensated casualty losses on her home.

[75]  Exh . W-1.

reached, but was insufficient to bring Debtor's plan current. Further, because more than sixty (60) months had expired since her petition date, a feasible modification could not be offered. Debtor owed $57,197.00 under her plan. The case was dismissed. It now appears Debtor had the means to complete her plan and satisfy any outstanding postpetition arrearages due to Bank of America or Flagstar.

Debtor's 2002 Schedules indicated monthly income from state employment sufficient to pay her living expenses, including her home mortgage, but not the plan's required payments or her mortgages on rental property.[76] Her plan contemplated that secured debts on rental property would be paid out of rental income, which Debtor represented was lost in the wake of the storm. Because of this representation, after February 2007 or for sixteen (16) months, Debtor was allowed to remain in bankruptcy despite no payments to Trustee. At the time, Debtor failed to disclose that her employment income had risen substantially or that her rental income had materially returned.[77]

Debtor is a state employee, a supervisor in the Louisiana Department of Social Services with over 31 years of experience. Her income was not affected by the storm. Although her home suffered roof damage, Debtor testified that it was habitable. She replaced her roof at a cost of $20,000.00 by using insurance proceeds of $11,000.00 and "additional funds." In later testimony, she admitted receiving a $30,000.00 grant from the Road Home. As a result, the Court concludes that Debtor's income was not disrupted nor did she suffer any extraordinary uncompensated living expenses as a result of the storm.

---

[76] P-13.

[77] 2008 Case, P-17, 18.

According to Debtor's Schedule I and SOFA filed in the 2008 case, Debtor's monthly gross income from employment had increased substantially from its initial level reported in 2002. In 2002, Debtor's annual gross income was $50,628.00. By 2006, her income had risen to $61,386.00. In 2007 it was $64,560.00 and in 2008, $68,796.00. Over the three-year period following Hurricane Katrina, these raises created a gross aggregate increase in employment income of $42,858.00 otherwise available to pay creditors.[78] Debtor did not disclose her increased income levels to the Court during the months Debtor was in her 2002 Case and complaining that she lacked sufficient funds to continue plan payments.

Other significant facts omitted by Debtor during the administration of her 2002 Case include:

1. Debtor received undisclosed tax refunds in the aggregate amount of $19,100.00;

2. Debtor received a Road Home Grant for $30,000.00;

3. Debtor obtained $11,000.00 in insurance proceeds on her home;

4. Rental income in 2007 was $12,800.00 and $16,800.00 in 2008;[79]

5. Mr. Worthy's income, derived from sales of used automobiles, was:

    2006   $15,000.00-$35,000.00
    2007   $10,000.00
    2008   $7,000.00;[80] and

---

[78] *Id.* The Court recognizes that some of the increase would be reduced by payroll taxes and cost of living increases. However, a substantial portion of the amounts earned would also have been available to claimants and Trustee.

[79] Debtor was under bankruptcy supervision from January 2008 to July 2008 in her 2002 Case, and again from November 2008 through December 2008 after the filing of the 2008 Case. Mr. Worthy testified that 2008 rental income was actually $16,800.00 in 2008 although Debtor's SOFA filed in the 2010 Case indicates $15,300.00.

[80] Debtor's 2002 Schedules represent that she was separated from her spouse. However, Debtor admitted reconciling in 2003, during the 2002 Case's administration. The couple maintained a community property regime and all income of her spouse was subject to the jurisdiction of the Court. Debtor's spouse testified alternatively to

6.  Debtor obtained family loans in the aggregate amount of $29,000.00.

The above facts only came to light through the testimony of Debtor and her husband and through careful review and questioning of the pleadings filed in the 2002, 2008 and 2010 Cases. The above receipts (aggregating $180,000.00) were more than sufficient to meet Debtor's obligations under plan, yet no payments were made after February 2007.[81]  For example, in 2007, the rents collected, Mr. Worthy's income and Debtor's increased salary generated almost $40,000.00 in additional disposable income.  Yet Debtor failed to escrow for disputed payments owed to Flagstar, pay State Farm or make even partial payments to Trustee.[82]

It is unassailable that during the 2002 Case, Debtor conducted herself well outside the bounds of good faith.  Following Hurricane Katrina, she received very large sums from multiple sources without disclosing any of them to the Court.  Debtor collected at least $180,000.00 from 2006 to July 2008.[83]  Despite this tremendous infusion of cash, Debtor failed to make the required payments on her plan or postpetition accruing payments to her lenders and misrepresented that she lacked the funds to do so.  Because Debtor had a solid history of payments to Trustee until Hurricane Katrina, the Court was unaware of Debtor's prior defaults to lenders postpetition or her prior filing

---

$35,000.00 and $15,000.00 in income in 2006.  For purposes of these Reasons, the Court will accept the lesser amount because the exact sum received is not critical to this decision.  Debtor's spouse did testify that he declared all his income on tax returns, although no returns were produced.

[81]  Rents and Mr. Worthy's income are prorated for 2008.

[82]  Debtor testified that she made no payments to State Farm after September 2003.  In addition, because Debtor was in litigation with Flagstar, she testified that no payments were made to Flagstar after August 2005.

[83]  Tax refunds ($19,100.00 from 2006 through 2008); Road Home grant ($30,000.00); insurance on St. Roch ($11,000.00); rental income ($12,800.00/2007; $16,800.00/2008); spousal income ($15,000/2006; $10,000.00/2007; $7,000/2008); family loans ($29,000.00); additional gross income ($10,758/2006; $13,932/2007; $18,168.00/2008). The total quoted has been prorated for 2008.

history.[84]  The Court mistakenly believed this was an honest, but unfortunate debtor, deserving of the Court's time.

Debtor argued that although she received the amounts set forth above, she expended cash to repair her rental properties and, therefore, lacked sufficient funds to make plan payments.  The evidence of this fact is dubious at best.  She offered no proof of repairs made in 2006, 2007 or 2008.  Not a single invoice, cancelled check, bank statement, receipt or credit card statement was offered into evidence.  Instead she offered only Mr. Worthy's testimony which consisted of general statements hardly sufficient to explain the expenditure of almost $180,000.00 in unreported income or funds received from 2006 to 2008.  As a consequence, the Court finds that Debtor has failed to account for the funds received or the expenses paid during her 2002 Case.

Even assuming, for the sake of argument, that the Court accepts Debtor's explanations as to how she used this cash, the math does not add up.  Mr. Worthy testified to *no repairs* in 2006 or 2007.  He alleged $53,700.00 in repairs on rental property in 2008, $25,000.00 of which were made on a North Broad Street property, after July 2008, with the use of the Flagstar settlement after the 2002 Case's dismissal.  But Mr. Worthy also testified to collecting $12,800.00 in rental income in 2007 and $9,800.00 in rental income in 2008, before the North Broad Street property was repaired and the 2002 Case was dismissed.  Based on the timing of repairs and rental income, the Court concludes that rental income alone was nearly sufficient to offset alleged repairs during 2008.

Further, during 2006, 2007 and 2008, Debtor also received tax refunds of $19,100.00; a Road Home grant of $30,000.00; $11,000.00 from homeowner's insurance; over $28,000.00 in income

---

[84] Although Debtor had filed four cases in the Eastern District of Louisiana including the 2002 Case, this Judge had not handled any of her cases and was not involved in the 2002 Case until September 9, 2005, ten days after Hurricane Katrina.

18

from her spouse and $29,000.00 in family loans or an additional $117.000.00.  During this period

same  period,  Debtor made $23,700.00 in plan payments and claims to have made an additional

$20,000.00 in roof repairs to her home.  This leaves $73, 400.00 in unaccounted for funds.

After staying creditors without payment for sixteen (16) months while Debtor litigated and

ultimately negotiated a settlement with Flagstar, she dismissed her case on the eve of payment rather

than use the funds to pay creditors.  Her position that dismissal was necessary because she could not

propose a feasible plan was disingenuous at best.  Given the amounts she received during her 2002

Case and the Flagstar settlement amount, Debtor could have paid off her plan and any postpetition

arrearages due to Flagstar or Bank of America.

By August 2008, Debtor had received over $232,000.00 in undisclosed funds from various

sources.[85]  In August 2008, as best as can be determined, Debtor owed Bank of America $7,176.00

in postpetition arrearages.[86]  Flagstar was owed $13,860.00 on the Humanity Loan postpetition.[87]

A lump sum payment of $57,197.00 would have completed the plan and discharged all prepetition

debt to Bank of America, Flagstar, and NOME.  Debtor had the resources to pay Bank of America,

Flagstar and complete her plan while retaining $153,000.00 to pay for alleged repairs to rental

property ($65,000.00),[88] repairs to her home ($20,000.00), attorney's fees ($12,000.00) and family

loans ($29,000.00) she claimed were satisfied by she and her spouse.

---

[85]   Added to the prior $180,000.00 received during the 2002 Case is $51,000.00 in settlement funds
received from Flagstar in July 2008, after the dismissal of the 2002 Case.

[86]   This assumes no payments to Bank of America from May 2008 to August 2008 at $1,794.00 per month.

[87]   This assumes no payments to Flagstar from September 2005 to August 2008 at $385.00 per month. The
Urusilines Loan had been paid off as part of the Flagstar settlement.

[88]   Mr. Worthy testified to repairs of $53,700.00 in 2008 and $11,600.00 in all of 2009.

Debtor has failed to establish that any of her decisions benefitted her estate or creditors. Debtor's position is that the funds were utilized, not for personal luxury, but to make repairs to her properties. She acknowledged that her income, tax refunds, and rents were subject to court supervision and control and that she used those funds without either.[89] Debtor has failed to demonstrate how her unilateral and unsupervised use of funds was of any benefit to claimants. From the Court's perspective, Debtor's conduct resulted in an inexcusable delay in the payment of prepetition debt and precluded foreclosure without the attendant payments due under her plan.

Facts following the Dismissal of the 2002 Case.

At the time the 2002 Case was dismissed, Debtor still owed Bank of America and Flagstar on loan arrearages incurred prior to 2002.[90] She also owed Flagstar for all payments accruing from September 2005 forward and payments to Bank of America for at least May and June 2008.

In July 2008, Flagstar paid $51,000.00 in settlement funds on Debtor's suit and cancelled her mortgage on Ursulines Street. Debtor allegedly used the funds to repay family members on outstanding loans, pay her attorney and repair her North Broad Street property. North Broad Street is one of Debtor's few properties unencumbered by a mortgage.

In July and August 2008 Debtor forwarded monthly payments to Flagstar and Bank of America. Both institutions returned her checks because they were insufficient to reinstate her loan. Although Flagstar appears to have entered into a five (5) month standstill agreement with Debtor on the Humanity Loan in connection with this settlement, it reinstituted foreclosure proceedings on

---

[89] Debtor alleged that she was unaware that her Road Home Grant, insurance proceeds, husband's income or loan proceeds were subject to Court jurisdiction and supervision. She admitted, however, that she did not seek advice of counsel of the subject either.

[90] As of the date of dismissal, Flagstar was still owed $12,297.50 in prepetition past due amounts on the Humanity Loan. Bank of America was still owed $11,552.00 on its postpetition arrearage.

the Humanity Street property in August 2008.[91]

The pending foreclosure by Flagstar and the return of the payments by Bank of America, led Debtor and her counsel to the conclusion that yet another bankruptcy filing was in her interest. For this reason, Debtor did not tender any additional payments on her home mortgage nor did she pay Flagstar for the months following the dismissal of her 2002 Case.[92]

<u>Events following the filing of the 2008 Case</u>

After receiving and spending the $51,000.00 Flagstar settlement, Debtor filed the 2008 Case, her fifth filing in nine (9) years.[93] Debtor filed her case with $11,450.00 in cash on hand.

Debtor's Schedules I and J detailed net employment income of $3,973.00 per month. Her spouse's testimony detailed $16,800.00 in rental income for 2008 and $27,500.00 in rental income for 2009.[94] In addition, her spouse admitted to income of $7,000.00 in 2008 and $3,000.00 in 2009.

In April 2009, following a five (5) month delay during which Debtor failed to appear at her §341(a) meeting of creditors and failed to make a single plan payment, her case was dismissed. Counsel for Debtor attempted to explain Debtor's lack of cooperation in connection with the 2008 Case by taking the blame himself. Mr. Schafer argued that due to an accident, he was incapacitated and could not represent Debtor from January 2009 through March 2009. As a result of his

---

[91] Exh. W-13.

[92] After dismissal of the 2002 Case in July 2008, Debtor used $12,000.00 of the Flagstar settlement to pay Mr. Schafer's legal fees and $29,000.00 to repay family members on loans. This left $10,000.00 in settlement proceeds, plus additional disposable income of at least six (6) months of mortgage payments not made to Bank of America ($10,764.00), and payments of $766 per month or $4,590.00 withheld from Flagstar. Based on Mr. Worthy's testimony, this $25,000.00 appears to have been used to repair North Broad. St.

[93] Debtor's 2008 Case was supervised by another judge in this district.

[94] In 2008, Debtor claimed $2,650.00 in rental income per month on Schedule J or $31,800.00 annually. 2008 Case, P-18.

incapacity, Mr. Schafer alleges that Debtor failed to appear at her §341(a) meeting.

The Court is well aware of Mr. Schafer's accident and can attest to his incapacity. However, *Debtor* failed to appear at her §341(a) meeting. This was not because she knew of Mr. Schafer's accident, but because she "called Mr. Schafer's office and didn't receive a return call." Because she did not hear from Mr. Schafer, she elected to absent herself from the noticed §341(a) meeting without contacting Trustee. This was not Debtor's first case but her *fifth*. She is educated, sophisticated and well aware of her obligations. The Court finds that she chose to ignore the directive to appear.

Debtor's 2008 Case was also dismissed because she failed to make *any* plan payments. Debtor allegedly made no payments because she lacked sufficient income. Again, Mr. Schafer alleges that due to his incapacity, he was unable to advise Debtor of her obligation to pay or adjust her proposed plan when those payments allegedly proved too onerous. A quick review of Schedules I and J filed in 2008 establishes that Debtor had sufficient resources to honor her 2008 plan obligations.

Debtor's net employment income in 2008 was $3,973.00. To this must be added the income of her spouse and the rents she received in 2008 and 2009.[95] The foregoing income increased her monthly gross by $1,983.00 per month in 2008 and $2,541.00 in 2009.

Debtor claimed $5,553.00 in monthly living expenses including $385.00 per month in

---

[95] Mr. Worthy testified that rental income in 2008 was $16,800.00 and in 2009 was $25,100.00. Debtor's schedule I filed in 2008 reflects rental income of $2,650.00 a month or $31,800.00 annually. Mr. Worthy's income was $7,000.00 in 2008 and $3,000.00 in 2009. Assuming for purposes of these Reasons that a lower amount of rent was collected, Debtor had $1,983.00 per month in gross income over and above her wages in 2008 and $2,342.00 per month in 2009.

mortgage payments to Flagstar and $855.00 to State Farm.[96]  It is now well established that Debtor

had no intention of ever paying State Farm nor had she done so since September 2003.[97]  She also

failed to pay, although owed, Flagstar its $384.00 monthly installment during her 2008 Case.

Therefore, her actual cash outflows from October 2008 through April 2009 were only $4,315.00 per

month leaving her with net cash of $1,642.00 per month in 2008 and $2,200.00 per month in 2009,

more than ample funds to make her required $1,070.00 payment to Trustee.

Debtor's bad faith on this point is underscored by the fact that she *made no attempt* at

payments, not even one partial payment.   It is also worth noting that when Debtor filed her 2008

Case, she held sufficient cash on hand to make ten (10)  plan payments, yet she failed to make even

one.[98]  Debtor's failures resulted in the dismissal of her 2008 Case.  Unfortunately for her creditors,

she received the benefit of a stay for over eight (8) months until the Order of dismissal was final.[99]

At trial and in response to the obvious existence of income, Debtor argued that her failure

to make plan  payments in her 2008 Case was due to additional repairs to her properties.  Mr.

Worthy testified to $11,600.00 in repairs for the entire year of 2009.[100]  With regard to alleged

capital expenditures, Debtor again failed to substantiate *a single expense* with invoices, canceled

checks, receipts, bank statements or credit card statements.  Even accepting Debtor's evidence of

---

[96]  2008 Case, P-18.

[97]  The Court cannot explain why State Farm has not pursued Debtor since its Motion for Relief from Stay
was granted in September 2003.  Seven (7) years later, the Court can only assume that State Farm was repaid
through forced placed insurance following Hurricane Katrina and, therefore, no longer holds a claim.

[98]  Debtor filed her 2008 case with $11,450.00 in cash on hand. *See*, 2008 Case, P-18.

[99]  Debtor moved for a new trial delaying the effect of dismissal for some months.  2008 Case, P-39, 58.

[100]  Repairs to North Broad Street were made after August 2008 but from the Flagstar settlement.  *See*, fn
92, *supra*.

capital expenditures, the difference does not explain, in fact refutes, Debtor's inability to pay her 2008 plan obligations.[101]   Debtor simply refused to comply.

Finally, *Debtor* elected to make these alleged repairs without Court supervision or approval. She also failed to consult counsel on any of these decisions.   She operated completely without concern for the law nor did she subject her decisions to the rigors of feasibility and the best interests of creditors' tests.   Instead, she lived in an alternative paradigm without Court supervision or involvement.  The Court believes it appropriate that she live with the consequences of her actions.

## III.  Conclusion

The Court finds that Debtor obtained a stay from payment of her obligations from August 2005 until July 2008 and again from November 2008 through July 2009.  During these periods, she failed to honor her obligations under confirmed or pending plans.  She failed to pay or escrow postpetition installments owed to secured creditors.  While Debtor had no intention of paying certain secured claims on an ongoing basis, she continued to list those payments as deductions against her income.  This reduced the amount of disposable income available to claimants while simultaneously increasing her available cash.  She failed to disclose to the Court, Trustee or creditors income, assets, claims and payments.  She failed to obtain approval for extraordinary expenditures on her properties or loans from family members.  During the short window of time following the dismissal of the 2002 Case and prior to the filing of the 2008 Case, Debtor repaid family members on loans, satisfied bankruptcy attorney's fees and failed to pay or escrow for ongoing monthly mortgage debt.  This had the effect of preferring repayment of insiders and professionals without the attendant review required during a case.  Debtor's actions constitute bad faith.  She has shown an inability to commit

---

[101]   Mr. Worthy testified that $25,100.00 in rents were collected against $11,600.00 in repairs in 2009. Debtor also had the aforementioned $11,450.00 in cash at the start of her case.

disposable income to the repayment of debt and has ignored the constraints and requirements of her

plans and the Bankruptcy Code.

For these reasons, Debtor's Motion for New Trial of the denial of her Motion for Extension

of the Automatic Stay is DENIED.  Confirmation of her plan is also DENIED as being proposed in

bad faith.  Debtor's case is DISMISSED as having been filed in bad faith, and the Court will impose

sanctions barring Debtor or her spouse from filing a petition for relief under Title 11 for a period of

forty-four (44) months following the dismissal of this case.

An Order in accord with these Reasons will be separately rendered.

New Orleans, Louisiana, May 18, 2010.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge